SCHUYLKILL PRODUCTS, INC., Joseph W. Nagle, Ernest G. Fink, Jr. and CDS Engineers, Inc., Petitioners

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 29, 2008.

Decided Oct. 22, 2008.

Publication Ordered Dec. 19, 2008.

Lane F. Kelman, Philadelphia, for petitioners.

John J. Robinson, Jr. and Jason M. Wolgemuth, Harrisburg, for respondent.

OPINION BY Judge PELLEGRINI.

Before this Court are preliminary objections filed by the Commonwealth of Pennsylvania, Department of Transportation (Department) in opposition to a Petition for Review filed in our original jurisdiction by Schuylkill Products, Inc., Joseph W. Nagle (Nagle), Ernest G. Fink, Jr. (Fink) and CDS Engineers, Inc. (CDS) (collectively, SPI) in which it alleges that the Department's debarment proceedings against SPI are improper and without authority.

According to the Petition filed by SPI, the facts pled are as follows. SPI is a

corporate entity with a business address in Cressona, Pennsylvania, and is in the business of manufacturing and/or fabricating bridge spans and prestressed concrete bridge beams. CDS is a wholly owned subsidiary of SPI. Nagle is the President and Treasurer of SPI and of CDS and Fink is the Vice–President and Secretary. It is one of the largest employers in Schuylkill County, employing 150 workers.

SPI is a "Bulletin 15 Supplier" which means it is listed as an approved manufacturer of materials that are supplied for use at Department construction projects. To be a Bulletin 15 Supplier, SPI had to meet certain technical and manufacturing criteria relating to quality control and performance of its product.

Prior to March, 2008, SPI was a contractor prequalified to perform erection services for the Department. On March 31, 2008, SPI voluntarily allowed its prequalification to lapse. Both before and after the lapse of its prequalification, SPI supplied (and currently supplies) its products as a Bulletin 15 Supplier for use by others in Commonwealth contracts. CDS was a subcontractor prequalified to perform erection services for the Department and, likewise, voluntarily allowed its prequalification to lapse. Since its prequalification lapsed, CDS has provided professional engineering services to contractors and subcontractors that perform construction for Department contracts.

In October, 2007, both SPI and CDS became aware of a criminal investigation when search warrants were issued for their businesses. As a result of evidence gathered, two former SPI employees pled guilty, *inter alia,* to taking kickbacks from a minority business enterprise, Marikina Construction Corporation. Those actions were outside the scope of their employment. Since the search warrants were issued, no other criminal charges were made. SPI continued to do business and supply its products. However, by letter dated June 19, 2008, the Department notified SPI and CDS of its Intent to Debar and deem them ineligible to further participate in any Commonwealth contract. The letter indicated the intent to debar was being sought pursuant to 67 Pa.Code § 457.13 (regarding reasons for debarment) and Management Directive 215.9 and because of alleged evidence that suggested SPI and CDS conspired to defraud certain entities, including the United States Department of Transportation. Consequently, counsel for SPI's and CDS' lender, M & T Bank (Bank), issued a letter stating that it was the Bank's position that the debarment proceedings might constitute a *per se* violation of their pre-existing loan contracts' terms and conditions and that the Bank would "now be analyzing, reviewing, and closely monitoring its banking relationship with SPI for current and future developments."[1] (Morton R. Branzburg July 1, 2008 Letter.)

As a result, SPI filed a six-count Petition for Review seeking declaratory and injunctive relief. In Count One–Declaratory Relief, it alleged that it was not subject to debarment because the management directive did not have the force and effect of law. In Count Two–Declaratory Relief,

---

1. The letter went on to state:

Please advise your client to review their documents, in regard to the various loans/financing arrangements in place with the Bank, so that your client can be made aware as to what remedies, if any, including but not limited to calling the loans, accelerating balances due, repossession, de-

faulting SPI, and other remedies that the Bank may avail itself regarding the banking relationship going forward.

By this letter, the Bank does not waive any rights or remedies it may have pursuant to the banking relationship and/or its loan documents, and places you on notice of same.

SPI v. the Department, it alleged that SPI was not a contractor or a subcontractor, but was a supplier, and the Prequalification Code, Procurement Code and the Directive did not apply to a supplier. In Count Three–Declaratory Relief, Nagle and Fink v. the Department, it alleged that Nagle and Fink did not contract with the Department and only individuals who contracted with the Department could be debarred. In Count Four–Declaratory Relief, SPI and CDS v. the Department, it alleged that due process was violated because the Department initiated the procedure to debar and also was going to make the final determination of whether the violation had occurred.[2] Finally, in Count Six–Permanent Injunction, SPI and CDS v. the Department, it alleged that a permanent injunction of the administrative debarment hearings was necessary because it was the only remedy that could abate the offending activity and it had no adequate remedy at law. Further, the debarment proceedings would cause immediate and irreparable injury to it because the proceedings, if not enjoined, would destroy SPI's and CDS' businesses.

The Department filed Preliminary Objections to the Petition for Review alleging: 1) that this Court lacks subject matter jurisdiction because SPI's claims are not ripe for judicial review and they have failed to exhaust their administrative remedies; and 2) in a demurrer, that SPI fails to assert a cause of action against the Department for which relief may be granted because Management Directive 215.9 has the full force and effect of law; Fink and Nagle are subject to debarment, and the debarment hearing process is not infirm.[3] SPI filed an Answer to the preliminary objections denying the allegations.

After a hearing before the Court, it issued an order dated September 29, 2008, determining that the parties would be limited to and ordering the parties to submit supplemental briefs on the following issue:

Whether the Commonwealth of Pennsylvania (Commonwealth), under Management Directive 215.9, as affected by any other statutes, may preclude a supplier

2. In Count Five–Preliminary Injunction in the Nature of a Stay, SPI and CDS v. the Department, it alleged that the administrative proceeding against SPI and CDS was premature and a stay had to be ordered to prevent prejudice against them. It alleged that by proceeding with debarment, its constitutional rights in the ongoing criminal investigation and potential criminal defenses might be compromised due to state action. By order dated July 31, 2008, we denied SPI's request for a preliminary injunction because it had not met the necessary criteria, and the Department's interest in protecting the integrity of its contracting system was "of the utmost importance and that issuing an injunction which, in effect, will prevent [the Department] from taking steps against persons and companies that have allegedly taken part in fraudulent activities would be improper and grossly inappropriate." (*Schuylkill Products, Inc. et al v. Commonwealth of Pennsylvania, Department of Transportation*, No. 353 M.D. 2008, Filed July 31, 2008, at 7.)

3. SPI then filed a Petition for Reconsideration by a three-judge panel alleging that since the Court issued its order denying its Application for injunctive relief, the Bank declared SPI to be in immediate default of its various loan obligations due to the fact that the Department had issued Notices of Intent to Debar them. SPI alleged that the Bank provided 100% of the financing for funding its day-to-day operations and M & T had by terms of a Forbearance Agreement agreed to temporarily forbear from terminating various loans and funding until September 30, 2008 in exchange for additional collateral and SPI's compliance with enhanced reporting requirements. The loss of its relationship with the Bank would cause the cessation of its business. By Court order dated September 2, 2008, the Petition for Reconsideration was denied.

On September 29, 2008, SPI filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court which is currently pending.

from doing business because the supplier has engaged in activities that would otherwise justify debarment.[4]

The Department contends that Management Directive 215.9 provides it with the authority to suspend and/or debar a supplier. It provides us with the following history behind the Management Directive: In June, 1990, then Governor Casey issued Executive Order 1990–3 which ordered the Secretary of the Budget and the Secretary of General Services to "coordinate the development of a contractor Responsibility Program designed to identify, evaluate, and sanction appropriately, contractors that do not meet the standards of responsibility, that render deficient performance, or that engage in wrongdoing, or other activity adversely affecting their fitness to contract with Commonwealth agencies." (Executive Order 1990–3.) The provisions of Executive Order 1990–3 are codified at 4 Pa.Code §§ 7–501–7–505. Pursuant to the Executive Order, the Contractor Responsibility Program was created and set forth in Management Directive 215.9. That Management Directive applies to all contracts entered into by executive agencies and seeks to ensure that the Commonwealth contracts only with responsible contractors. *See* Management Directive 215.9(1) and (2). The Department, as an executive agency, must participate in the maintenance and management of the Contractor Responsibility Program. 62 Pa. C.S. §§ 301(c), 321(6).

The Department refers us to the standards and procedures for agency determinations of contractor responsibility and procedures to suspend and debar a contractor at Management Directive 215.9(3)(c) and (d) which provide:

3. **Objectives.**

(c) Provides for agency investigations of allegations of contractor nonresponsibility.

(d) Provides standards and procedures for agency determinations of contractor responsibility.

The Department then directs our attention to the definition of "Debarment" which is defined as "Action taken by the head of the purchasing agency to remove a contractor from consideration for an award of any Commonwealth contract." Management Directive 215.9(5)(j). "Contractor" is defined as

> *Any person,* including but not limited to, a bidder, offeror, loan recipient, grantee, or subgrantee, *who has furnished or seeks to furnish goods, supplies,* services, or leased space, or who has performed or seeks to perform construction activity, *under contract, subcontract,* grant, or subgrant *with the Commonwealth, or with a person under contract, subcontract,* grant, or subgrant *with the Commonwealth* or its state-affiliated entities, and state-related institutions. The term contractor may include permittee, licensee, or any agency political subdivision, instrumentality, public authority, or other entity of the Commonwealth. (Emphasis added.)

Management Directive 215.9(5)(g). This definition incorporates all subcontractors which are defined as "[a]ny person contracting to perform or supply part or all of another's contract." Management Directive 215.9(5)(t). "Supplier" is defined as a "[p]rovider of any supplies for a Commonwealth contract." Management Directive 215.9(5)(v). Relying on these definitions, the Department argues that it may suspend and/or debar any person who has furnished or seeks to furnish goods or

---

4. Because this issue would decide the matter, the Court determined that the Department's preliminary objections need to be addressed.

supplies under contract or subcontract with the Commonwealth by reason of committing a criminal offense or any other act or omission indicating a lack of business integrity or business honesty.[5]

The Department also contends that in addition to debarring a supplier directly, it may preclude a supplier from performing on a Department contract by denying the contract award if the contractor fails to certify that it will not use a debarred entity in the performance of the contract. It refers us to Management Directive 215.9(a)(1)(A) which provides:

> The contractor must certify in writing for itself and all its subcontractors that neither the contractor nor any subcontractors nor any suppliers are under suspension or debarment by the Commonwealth or any governmental entity, instrumentality, or authority and if so, provide an explanation regarding the reasons for the suspension or debarment.

Further, the Management Directive provides:

> (e) A determination of responsibility shall be made by the agency in its sole discretion. If the agency declares a contractor to be nonresponsible, the contractor shall be ineligible for the contract and the Commonwealth Contractor Responsibility File shall be updated accordingly.
>
> * * *
>
> (5) The agency cannot determine a contractor to be responsible if the contractor has failed to certify under Section 7a(1)(A) and (B).

Management Directive 215.9(7)(b)(3) and (5). Based on these Management Directives, the Department contends that it may preclude SPI and its officers from doing business because they have engaged in activities that would justify debarment.

SPI disagrees and argues first that the Department's use of the Management Directive is improper because it is only an internal procedural directive and not a regulation. It directs our attention to *Pennsylvania Institutional Health Services, Inc. v. Commonwealth, Department of Corrections (DOC) (PIHS II)*, 168 Pa. Cmwlth. 135, 649 A.2d 190 (1994), a case very similar to the one now before use, where a contractor for the DOC brought an equity action challenging the constitutionality of Management Directive 215.9 governing the debarment of Commonwealth contractors. In *PIHS II*, an inmate at one of the State Institutions died from dehydration and, as a result, the PIHS was notified that it was suspended from contracting with the DOC. PIHS was later notified that the DOC was considering whether to debar PIHS from contracting with the Commonwealth because it was allegedly "engaging in acts or omissions to act which substantially contributed to the death of" the inmate. PIHS filed a petition for review requesting injunctive relief to which the DOC filed preliminary objections. We overruled DOC's preliminary objections and ordered it to respond to the petition for review. The DOC then filed a motion for summary judgment. One of the issues in the motion was whether Management Directive 215.9 should have been promulgated as a regulation in

---

5. *See* Management Directive 215.9(7)(k)(2)—Commission of fraud or a criminal offense or other improper conduct or knowledge of, approval of, or acquiescence in such activities by a contractor of any affiliate, office, employee, or other individual or entity associated with obtaining, attempting to obtain or performing a public contract or subcontract will be cause for debarment. *See also* Management Directive 215.9(7)(k)(12)—Any other act or omission indicating a lack of skill, ability, capacity, quality control, business integrity, or business honesty that seriously and directly affect the present responsibility of a contractor as determined by the purchasing agency will be cause for debarment.

accordance with the Commonwealth Documents Law.[6]

In PIHS' petition, it pled that DOC had not promulgated any rules or regulations relating to the suspension or debarment and had no rules or procedures governing administrative challenges to its procurement-related decisions such as debarment and suspension. Because DOC had not, in fact, promulgated any regulations and determined that the Management Directive was not a disguised regulation,[7] "but instead a valid exercise of the Governor's power and responsibility with respect to executive agency professional services contracts," we denied PIHS' application for summary judgment, dismissed the complaint and transferred the matter to the appropriate administrative forum for further proceedings. In this case, however, the Department has promulgated 67 Pa. Code § 457.13 relating to suspension or debarment and 67 Pa.Code § 457.14 relating to debarment appeals procedure so whether the Management Directive is or is not a regulation is not helpful in deciding this case.

SPI also argues that management directives do not automatically have the force and effect of law. Citing *Cutler v. State Civil Service Commission (Office of Administration)*, 924 A.2d 706, 711–712 (Pa.Cmwlth.2007), SPI states that a management directive is only valid and binding "as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable.... *In no event, however, may any executive order be contrary to any constitutional or statutory provision,*

nor may it reverse, countermand, interfere with, or be contrary to any final decision or order of any court ... [these] principles have been applied with equal force to management directives.... In order to be enforceable, therefore, a management directive must 'track' the code upon which it is based." (Emphasis added.) SPI argues that even though Executive Order 1990–3 allows for the creation of the Contractor Responsibility Program and is codified at 4 Pa.Code §§ 7–501–7–505, neither the Executive Order nor that Code section sets forth the process, procedure or scope of debarment procedures. Rather, debarment procedures are set forth in the Prequalification Code[8] found at 67 Pa.Code § 457.13. SPI further contends that the Department is incorrect that the Management Directive provides it with the authority to debar a supplier and its officers because it is not a regulation, but instead is an internal procedural directive because it was not promulgated as a regulation and is unenforceable because it is contrary to statute and regulation. We agree.

In *Cutler*, we were faced with the same question based on different facts. There, the issue was whether "Management Directive 580.21(2)(d), which limited the veterans' preference to a one-time use by employees in the classified service, expressed a correct interpretation of Chapter 71 of the Military Affairs Code entitled 'Veterans' Preference 51 Pa.C.S. §§ 7101–7109." 924 A.2d at 710. Specifically, Management Directive 580.21(2)(d) provided that "Current classified service employees assigned regular or probationary status ... are not eligible for the veterans'

---

**6.** Act of July 31, 1968, P.L. 769, *as amended*, 45 P.L. §§ 1101–1602. Section 101 of the Commonwealth Documents Law, 45 P.S. § 1101, which was the short title to the Commonwealth Documents Law, was repealed by the Act of July 9, 1968, P.L. 769, 877.

**7.** DOC argued that the Management Directive did not have to be promulgated because under the definition of "administrative regulations" it was not a document that had to be promulgated under the Commonwealth Documents Law. 45 P.S. § 1102(12).

**8.** 67 Pa.Code §§ 457.1–457.17.

preference in 2.a." The State Civil Service Commission had dismissed Cutler's appeal, which he contended was in error because the Management Directive was not consistent with the Military Affairs Code. We stated that what mattered was whether the content of the Management Directive correctly implemented the Military Code and held that it was not binding on this Court. We then determined that it was not an administrative regulation adopted by an agency pursuant to an express grant of legislative rule-making authority, but instead was a directive designed to implement the veterans' preference law with regard to Commonwealth employees. It was only enforceable if it was consistent with a statute and if it tracked Chapter 71 of the Military Affairs Code. We determined that Management Directive 580.21(2)(d) did not track the plain language of Chapter 71 of the Military Affairs Code and was unenforceable because Section 7103(a) of the Military Affairs Code mandated that a veteran receive 10 additional points on every civil service exam whenever he successfully passed a civil service appointment or promotional exam for a public position with the Commonwealth. "The Supreme Court has never held that a veteran's preference is limited to a single use in a career in public employment. To the contrary, as noted by our Supreme Court, 'section 7104(b) [of the Military Affairs code] clearly intends for the mandatory preference to apply to *all appointments, entry-level or otherwise,* and that the statute does not thereby operate in an unconstitutional manner.'" *Id.,*

924 A.2d at 715–716. Ultimately, we held that Management Directive 580.21(2)(d) was not consistent with the plain language of Chapter 71 of the Military Affairs Code and the Commission's hold had to be set aside.

Just as in *Cutler,* in this case, the language as set forth above in the Executive Order/Contractor Responsibility Program at 4 Pa.Code §§ 7–501–7–505, does not discuss debarment at all, but only speaks in general terms about general standards of contractor responsibility. As SPI correctly points out, debarment procedures are found in the Prequalification Code at 67 Pa.Code § 457.13 and the debarment appeal procedure at 67 Pa.Code 457.14. Clearly, the Contractor Responsibility Program does not "track" the Executive Order. Consequently, the Department's preliminary objections must be denied.

Finally, we note that the Department raises in its preliminary objections that SPI has failed to exhaust its administrative remedies because the Department has not yet addressed SPI's "challenges to the interpretation and application of its debarment procedures, which is well within its expertise." (Preliminary objections at 2.) It cites *LeGrande v. Commonwealth of Pennsylvania, Department of Corrections,* 894 A.2d 219 (Pa.Cmwlth.2006), for the proposition that the doctrine of exhaustion of administrative remedies requires the administrative agency charged with regulatory and remedial review to address issues within its expertise before judicial review attaches.[9]

9. In that case, an inmate filed a petition for review in the nature of mandamus seeking an order directing DOC to recalculate his new sentence in accordance with the trial court's sentencing order. DOC filed preliminary objections challenging, *inter alia,* this Court's jurisdiction. DOC argued that we lacked jurisdiction because the inmate failed to exhaust all available administrative remedies before seeking judicial review. We agreed that an inmate had to exhaust all available administrative remedies to preserve the integrity of the administrative process and to allow the agency to address issues within its expertise before judicial review attached, but in *LeGrande,* we were unable to tell from the facts pled whether he had failed to exhaust all of his available administrative remedies and overruled DOC's preliminary objection.

However, in *Northern Area Personal Care Home Administrators Association v. Commonwealth, Department of Public Welfare,* 899 A.2d 1182 (Pa.Cmwlth.2006), we decided otherwise. There, it was alleged that the Department of Public Welfare's (DPW) regulations were problematic and DPW alleged that the Association had to exhaust its administrative remedies before filing a petition with this Court. We relied on our Supreme Court's decision in *Arsenal Coal Company v. Department of Environmental Resources,* 505 Pa. 198, 477 A.2d 1333 (1984), where the Court explained that this court had original jurisdiction in a case seeking pre-enforcement review of a substantial challenge to the validity of regulations promulgated by an administrative agency. A remedy by statute was inadequate when it gave the agency the power to hold a hearing and issue an adjudication only after an order or decision had been issued. Our Supreme Court further provided guidelines as to when a challenged regulation could be heard by this Court without first exhausting other administrative remedies:

Where the effect of the challenged regulations upon the industry regulated is direct and immediate, the hardship thus presented suffices to establish the justiciability of the challenge in advance of enforcement. [Citations omitted.] We believe that the asserted impact of the regulations in the instant case is sufficiently direct and immediate to render the issue appropriate for judicial review, the lengthy process by which the validity of the regulations will be addressed on a basis of application to the litigant would result in ongoing uncertainty in the day to day business operations of an industry which the General Assembly clearly intended to protect from unnecessary upheaval. *Arsenal Coal Company,* 505 Pa. at 210, 477 A.2d at 1339.

*Northern Area Personal Care Home,* 899 A.2d at 1187.

In this case, because SPI is challenging the validity of debarment procedures/regulations found at 67 Pa.Code § 457.13, *Arsenal Coal Company; Northern Area Personal Care Home,* and the outcome will directly and immediately affect the day to day business of its operations, it need not exhaust its administrative remedies.

Accordingly, the Department's preliminary objections are denied.

### ORDER

AND NOW, this 22nd day of October, 2008, the preliminary objections filed by the Commonwealth of Pennsylvania, Department of Transportation, are denied.