# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jessica Markham, Victoria Markham, | : | |
| Jesse Charles, Pennsylvania Homecare | : | |
| Association, United Cerebral Palsy of | : | |
| Pennsylvania, | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 176 M.D. 2015 |
| | : | Argued: June 8, 2016 |
| Thomas W. Wolf, in his Official | : | |
| Capacity as Governor of the | : | |
| Commonwealth of Pennsylvania, | : | |
| Department of Human Services, | : | |
| Office of Long Term Living, | : | |
| Respondents | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE ROBERT SIMPSON, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge

**OPINION**
**BY JUDGE SIMPSON**          **FILED: September 22, 2016**

In this case in our original jurisdiction, we are asked to determine the validity of an executive order which purports to create new arrangements for direct care workers who provide personal services to certain aged and disabled participants in their homes. We are mindful of the respect and privacy afforded to a person in his or her home, dating back at least to Elizabethan England, and expressed in the words of Sir Edward Coke: "For a man's home is his castle, *et domus cuique tutissimum refugium*."[1]

---

[1] Sir Edward Coke, THIRD INSTITUTE OF THE LAWS OF ENGLAND 162 (1644). The Latin means: "and his home his safest refuge." See Semayne's Case (1603) 77 Eng. Rep. 194 (K.B.)
**(Footnote continued on next page…)**

More particularly, before this Court are the parties' cross-applications for summary relief. Jessica Markham, Victoria Markham, Jesse Charles, Pennsylvania Homecare Association (PHA), and United Cerebral Palsy of Pennsylvania (UCP) (collectively, Petitioners) filed a petition for declaratory and injunctive relief seeking to invalidate an executive order issued by Governor Thomas W. Wolf (Governor Wolf) pertaining to direct care workers (DCW) whose services to eligible aged or disabled individuals are paid by the Department of Human Services, Office of Long Term Living (Department). The Department and Governor Wolf (collectively, Respondents) also filed preliminary objections, which are before us for disposition.

Petitioners assert the executive order is an unauthorized exercise of power, is unconstitutional and is in conflict with existing labor and health laws. Respondents counter that Petitioners lack standing and their challenge lacks merit. Upon review, we grant Petitioners' application for summary relief as to certain provisions of the Executive Order (Sections 3, 4, and related parts of Sections 1 and 5). Also, we deny Respondents' application for summary relief (as to Sections 3, 4, and related parts of Sections 1 and 5), but allow other portions to remain. Further, we overrule their preliminary objections to the extent they are not mooted by our decision on the merits.

---

**(continued…)**

("[T]he house of everyone is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose.") (addressing "knock and announce" rule).

# I. Background

## A. Home Care Programs

On February 27, 2015, Governor Wolf issued Executive Order No. 2015-05 (Executive Order), entitled "Participant-Directed Home Care Services." See 45 Pa. B. 1937 (April 18, 2015). The Executive Order focused on individuals who receive, and the DCWs who provide, in-home personal (non-medical) care pursuant to the Attendant Care Services Act, 62 P.S. §§3051-3058 (Act 150),[2] and federal Medicaid waiver programs.

The Department administers Act 150[3] and the Medicaid waiver programs, including the: Aging Waiver; Attendant Care Waiver; CommCare Waiver; Independence Waiver; and, OBRA Waiver Program (collectively, Home Care Programs). The Department oversees home care services and administers the funding for Home Care Programs. The Department also files the Medicaid waivers with the U.S. Department of Health and Human Services, representing that the elderly or disabled participant in the program employs DCWs eligible for payment.

It is clear that we are addressing home-based services rendered to some of our neediest citizens where they live. Individuals receiving home care services are "participants." 55 Pa. Code §52.3. Under the Home Care Programs, DCWs provide personal care and domestic services to enable participants to live at home rather than in an institution. At times, a DCW is a participant's relative, residing at the same address.

---

[2] Act of December 10, 1986, P.L. 1477.

[3] Act 150 affords care to physically disabled persons ages 18-59.

Home care services are directed either by participants, under the Participant Model, or by agencies under the Agency Model. Under the Participant Model, DCWs are recruited, hired, and managed by a participant who employs the DCW. By contrast, under the Agency Model, a home care agency recruits, hires and manages the DCW. As employers, participants have federal employer identification numbers, are subject to workers' compensation and unemployment requirements, and pay relevant employer taxes. Under Act 150, participants have the "right to make decisions about, direct the provision of and control … [home] care services." Section 2(3) of Act 150, 62 P.S. §3052(3). Thus, participants' control over their care is unfettered other than compliance with home care service regulations.

In sum, participants have three roles: they receive personal care and domestic services; they receive the services where they reside; and, they employ the persons who render the services in their homes.

**B. Executive Order**

The Executive Order governs the relationship between DCWs and the Department.[4] As such, it pertains only to the Participant Model. The Executive

---

[4] The Executive Order, in its entirety, provides:

WHEREAS, the administration is committed to ensuring that Pennsylvania residents have access to quality home care services; and

WHEREAS, [DCWs] are individuals who provide vital home care services to Pennsylvania's seniors and people with disabilities who require assistance; and

WHEREAS, without assistance from [DCWs] who are paid through various programs administered by the [Department] through its Office of Long Term Living, these residents otherwise would require Institutional care, such as that provided in a nursing home; and

**(Footnote continued on next page…)**

4

**(continued…)**

WHEREAS, residents who are consumers of in-home personal care services must maintain the right to select and direct the daily work of [DCWs] who provide services through the programs administered by the [Department]; and

WHEREAS, the average cost of providing in-home personal care services is typically much less than the cost of care provided in nursing homes or similar institutional settings, and Pennsylvania's home care services programs therefore save the Commonwealth millions of dollars per year; and

WHEREAS, the demand for direct home care services is expected to rise in the coming years in light of Pennsylvania's aging population; and

WHEREAS, the quality of life for Pennsylvania's seniors and people with disabilities is significantly improved by the option of received self-directed in-home care services; and

WHEREAS, [DCWs] typically earn low wages and receive no benefits, paid time off, or standardized training; and

WHEREAS, as a result, the pool of [DCWs] available for consumers of in-home care services in Pennsylvania suffers from high turnover and inconsistent quality; and

WHEREAS, reform of the Commonwealth's home care programs requires careful consideration of its economic impact and must ensure Pennsylvania's right to receive the maximum amount of Federal funds to which it is entitled and, therefore, should be informed by input from all interested stakeholders; and

WHEREAS, the administration believes there is a need to improve both the quality of home care and the working conditions of [DCWs] and that these two goals are related;

NOW, THEREFORE, I, [Governor Wolf], by virtue of the authority vested in me by the Constitution and laws of the Commonwealth of Pennsylvania, do hereby direct the following:

1. Definitions. As used in this Executive Order, the following definitions shall apply:

a. "Department" means the Department of Human Services.

b. "Deputy Secretary" means the Deputy Secretary of Human Services for Long Term Living.

c. "Direct Care Worker" means a person who provides Participant-Directed Services in a Participant's home under a Home Care Service Program.

**(Footnote continued on next page…)**

5

**(continued…)**

d. "Direct Care Worker List" means a monthly list compiled at the direction of and maintained by the Department of the names and addresses of all [DCWs] who have within the previous three (3) months been paid through a Home Care Service Program that provides Participant-Directed services. The list shall specify the program through which each [DCW] is paid, but nothing that would identify the name of any participant.

e. "Direct Care Worker Representative" means the designated representative elected according to the procedure outlined in Paragraph 3.

f. "Home Care Service Programs" means the following programs administered by OLTL, and any successor program:

(1) The Aging Waiver Program.
(2) The Attendant Care Waiver Program.
(3) The CommCare Waiver Program.
(4) The Independence Waiver Program.
(5) The OBRA Waiver Program.
(6) The Act 150 Program.

g. "OLTL" means the Department's Office of Long Term Living.

h. "Participant" means a person who receives services from a [DCW] under a Home Care Service Program.

i. "Participant-Directed Services" means personal assistance services, respite, and Participant-Directed community supports or similar types of services provided to a senior or a person with a disability who requires assistance and wishes to hire, terminate, direct and supervise the provision of such care pursuant to the Home Care Service Programs, provided now and in the future, to (i) meet such person's daily living needs, (ii) ensure such person may adequately function in such person's home, and (iii) provide such person with safe access to the community. Participant-Directed Services does not include any care provided by a worker employed by an agency as defined by Section 802.1 of the Health Care Facilities Act[.] [Act of July 19, 1979, P.L. 130, as amended,] (35 P.S. §448.802a).

j. "Secretary" means the Secretary of Human Services.

2. **Advisory Group on Participant-Directed Home Care.** There is hereby established an Advisory Group to ensure the quality of long-term Participant Directed Home Care that shall be known as the Governor's Advisory Group on Participant-Directed Home Care. The Advisory Group shall advise the Governor's Office and executive branch agencies and offices of the Commonwealth (including the Department) on ways to improve the quality of care delivered through the Home Care Services Programs.

**(Footnote continued on next page…)**

**(continued…)**

a. The Advisory Group shall be composed of seven (7) members, who shall serve at the pleasure of the Governor. The seven members shall include the Secretary, or a designee (who shall serve as chairperson of the Advisory Group), and the Deputy Secretary, or a designee. The remaining five (5) members of the Advisory Group shall be appointed by the Governor, and will include both participants or their surrogates and advocates for seniors and people with disabilities.

b. Commencing no later than June 30, 2015, the Advisory Group shall meet at least quarterly to study and discuss the experiences and best practices of other states that administer similar programs to provide Participant-Directed Home Care Services. In particular, the Advisory Group shall review the following subjects:

(1) Establishment and maintenance of policies, practices and procedures designed to ensure that the Commonwealth continues its efforts to reduce the numbers of Pennsylvania residents currently on waiting lists to receive services through the Home Care Service Programs.

(2) Evaluation of the work of OLTL so as to ensure that the program standards of the Home Care Service Programs are being met as they apply to the provision of Participant-Directed Services. However, the Advisory Group shall not be allowed to review the activities of the Department pertaining to pending reviews and investigations that involve potential fraud or criminal conduct, unless the information is publicly available.

(3) Establishment and maintenance of policies, practices and procedures designed to ensure that the Commonwealth continues its efforts to rebalance resources for long term care services from institutional care to home and community based services.

(4) Establishment and maintenance of policies, practices and procedures designed to ensure that the Commonwealth continues to adhere to the principles of participant-direction, independent living and consumer choice.

(5) Any other issues that the Governor may deem appropriate.

3. **[DCW] Representative.** The Secretary shall recognize a representative for the [DCWs] for the purpose of discussing issues of mutual concern through a meet and confer process.

a. **Election Process.** The Secretary shall designate the American Arbitration Association [AAA] to conduct an election and certify the election outcome, pursuant to the following process:

(1) An election shall be conducted to designate a representative when an organization seeking to be so designated presents signed authorization cards to the Governor, or his designee, demonstrating that at least ten (10%) percent of the providers identified on the most recent [DCW] List (as described below) choose to be represented by such organization.

**(Footnote continued on next page…)**

**(continued…)**

(2) All [DCWs] identified on the most recent [DCW] List (at the time the election is requested) shall be eligible to vote in an election. If the majority of votes cast in the election are for the petitioning organization, the American Arbitration Association shall certify the election results, and the Secretary shall recognize the organization as the [DCW] Representative. There shall only be one [DCW] Representative recognized at any time.

(3) The recognized [DCW] Representative shall continue to act as such for so long as such organization complies with its responsibilities concerning representation of [DCWs]. [DCWs] who wish to remove the [DCW] Representative shall seek such removal in accordance with the election process set forth in this Order. [DCWs] may not seek such removal earlier than one (1) year after the organization is recognized as the [DCW] Representative.

b. **Meet and Confer Process.** The Secretary, the Deputy Secretary, and the [DCW] Representative shall meet and confer to address concerns of [DCWs] and ways to improve the quality of care provided under the Home Care Services Programs.

(1) The Secretary, the Deputy Secretary and the [DCW] Representative shall meet at least monthly, on mutually agreeable dates and times.

(2) The Secretary, the Deputy Secretary and the [DCW] Representative shall discuss relevant issues, including the following:

(a) The quality and availability of Participant-Directed Services in the Commonwealth, within the framework of principles of participant direction, independent living and consumer choice.

(b) The improvement of the recruitment and retention of qualified [DCWs].

(c) The development of a [DCW] registry or worker participant matching service to provide routine, emergency and respite referrals of qualified participants who are authorized to receive long-term, in-home care services under one of the Home Care Service Programs.

(d) Standards for compensating [DCWs], Including wage ranges, health care benefits, retirement benefits and paid time off.

(e) Commonwealth payment procedures related to the Home Care Services Programs.

(f) Development of an orientation program for [DCWs] working in a Home Care Services Program.

(g) Training and professional development opportunities for [DCWs].

(h) Voluntary payroll deductions for [DCWs].

**(Footnote continued on next page…)**

8

(3) The [DCW] Representative shall have the opportunity to meet with the Governor, or his designee, at least once annually to discuss the outcome of the meet and confer sessions with the Secretary.

c. **Memorandum of Mutual Understanding.**

(1) Mutual understandings reached during the meet and confer process shall be reduced to writing. Where appropriate, and with the approval of the Governor, understandings reached through the meet and confer process will be implemented in the policy of the Department related to [DCWs] providing Participant-Directed Services. If any such mutual understanding requires legislation or rulemaking, the [DCW] Representative may make recommendations for legislation or rulemaking to the relevant body.

(2) Nothing in this Executive Order shall compel the parties to reach mutual understandings.

(3) In the event the parties are unable to reach mutual understandings, the Governor or a designee will convene a meeting of the parties to understand their respective positions and attempt to resolve the issues of disagreement.

4. **[DCW] List.**

a. The Secretary shall compile a list each month of the names and addresses of all [DCWs] ("DCW List") who, within the previous three (3) months, have been paid through a Home Care Service Program that provides Participant-Directed Services. The DCW List shall specify every program through which each [DCW] was paid. However, the DCW List shall not include the name of any participant, any designation that a [DCW] is a relative of a participant, or any designation that the [DCW]'s home address is the same as a participant's address.

b. An employee organization that has as one of its primary purposes the representation of [DCWs] in their relations with the Commonwealth or other public entities may petition the Secretary to represent a particular unit of [DCWs].

c. Upon a showing made to the Secretary by an employee organization described in Subparagraph 4.a. that at least 50 [DCWs] support the organization's petition to provide representation, the Secretary within seven (7) days shall provide to the organization the most recent DCW List, and, for an additional six (6) months thereafter, upon request shall supply subsequent monthly lists.

d. Any vendor or contractor that provides financial management services for the Commonwealth in connection with any Home Care Service Program shall assist and cooperate with the Department in compiling and maintaining the DCW List. The Secretary shall ensure that all existing and future contracts with vendors or contractors providing financial management services for the Commonwealth require the fiscal intermediary to cooperate in the creation and maintenance of the DCW List.

**(Footnote continued on next page…)**

Order establishes a new policy-making body regarding the provision of home care.

_____

**(continued…)**

5. **No Change to Existing Rights and Relationships.**

a. Nothing in this Executive Order shall be construed to limit communication between or among Commonwealth employees, representatives of employee associations, the heads of executive branch agencies, and the Governor. The provisions of this Executive Order shall not be construed or interpreted to diminish any rights, responsibilities, powers or duties of individual employees in their service to the Commonwealth. Further, the provisions of this Executive Order shall not diminish or infringe upon any rights, responsibilities, powers or duties conferred upon any officer or agency by the Constitution or laws of the Commonwealth of Pennsylvania.

b. Nothing in this Executive Order shall be interpreted to grant [DCWs] the status of Commonwealth employees. The provisions of this Executive Order shall not be construed or interpreted to create collective bargaining rights or a collective bargaining agreement under any federal or state law.

c. Nothing in this Executive Order or in any [MOU] that may be reached hereunder shall alter the unique relationship between the individual participants and [DCWs]. Participants shall retain the rights to select, hire, terminate and supervise a [DCW]. This Executive Order is not intended to grant any right, or to imply that [DCWs] have any right, to engage in a strike or other collective cessation of the delivery of services.

d. Nothing in this Executive Order, or in any [MOU] that is reached hereunder, shall alter the rights of [DCWs], including the right to become a member of a labor organization or to refrain from becoming a member of labor organization.

e. In accordance with all applicable federal and Commonwealth laws, all existing or future vendors or contractors providing financial management services for the Commonwealth shall refrain from interfering with a [DCW]'s decision to join or refrain from joining a labor organization.

f. This Executive Order and any [MOU] reached hereunder shall not be interpreted to require a [DCW] to support a labor organization in any way.

g. Nothing in this Executive Order, or in any [MOU] that is reached thereunder, shall limit a DCW's ability individually or in concert with others, to petition the Commonwealth regarding any issue of concern.

6. **Cooperation by Commonwealth Agencies.** Agencies under the Governor's jurisdiction shall take all steps necessary to implement the provisions of this Executive Order.

7. **Effect and Duration.** This Executive Order shall be effective immediately and remain in effect until amended or rescinded by the Governor.

See Ex. A to Pet'rs' Pet. for Review.

10

The Executive Order also allows DCWs to elect an employee organization with which the Department must meet and discuss certain issues. In so doing, the Executive Order empowers non-Commonwealth employees to negotiate with the Commonwealth through a newly created position of a DCW representative.

To aid the election process, on a monthly basis, the Department is required to compile a list of the names and addresses of all DCW workers (DCW List), who, within the three previous months, were paid through a Home Care Program that provides services under the Participant Model.

Section 2 of the Executive Order establishes an advisory group to advise the Governor and the Department "on ways to improve the quality of care delivered" through Home Care Programs (Advisory Group). Executive Order (E.O.) at 3. The Advisory Group is comprised of the Secretary of the Department (Secretary) and five members appointed by the Governor, including participants and advocates for seniors and persons with disabilities. The Advisory Group shall meet at least quarterly and discuss: (1) reducing the waiting list to receive services through Home Care Programs; (2) evaluating the Department to ensure program standards are met; (3) rebalancing Commonwealth resources from institutional care to home and community based services; (4) ensuring the Commonwealth adheres to the principles of participant direction, independent living and consumer choice; and, (5) "[o]ther issues that the Governor may deem appropriate." Id. at 4.

Section 3 of the Executive Order creates a process for organizing the DCWs under an employee organization authorized to represent DCWs in their

11

relations with the Commonwealth. Any employee organization may petition the Department to represent DCWs once it demonstrates that 50 DCWs support its representation. The employee organization is then entitled to obtain the DCW List, which it may use to solicit membership in the organization.

The Executive Order requires the Secretary to designate the American Arbitration Association (AAA) to conduct an election for a representative of the DCWs, and to certify the election outcome pursuant to the process in the Executive Order. The Executive Order provides AAA shall conduct an election when an employee organization demonstrates support from at least 10% of the DCWs on the DCW List. All DCWs are eligible to vote in the election. Provided the organization meets the 10% threshold, a majority of votes cast determines which organization serves as the DCW representative (Designated Representative). Only one Designated Representative may be recognized at any time.

The Executive Order mandates the Secretary, the Deputy Secretary and the Designated Representative <u>meet and confer</u>, at least monthly, regarding concerns of DCWs and ways to improve the quality of care. Specifically, the Executive Order requires the Secretary and Deputy Secretary to discuss DCWs' terms and conditions of employment with the Designated Representative.

In Section 3(c) entitled, "Memorandum of Mutual Understanding" (MOU), the Executive Order further provides the "[m]utual understandings reached during the meet and confer process <u>shall be reduced to writing</u>[,] [and] [w]here appropriate … understandings reached through the meet and confer

process will be implemented as the policy of the Department ….”  E.O. at 5 (emphasis added).  Then, the Designated Representative may make recommendations for legislation or rulemaking as needed.  Although the Executive Order does not compel the Department and the Designated Representative to reach a MOU, in the event they do not, the Governor shall meet with the Department and Designated Representative “and attempt to resolve the issues of disagreement.”  Id. While the Executive Order allows the DCW Representative to meet with the Governor, it does not afford participants an opportunity to meet with the Governor.

Section 4 of the Executive Order addresses the DCW List, to be used by a prospective employee organization in contacting DCWs.

Section 5 of the Executive Order is entitled “No Change to Existing Rights and Relationships.”  Some of the provisions, however, refer to new relationships that may arise during the operation of the Section 3(a) election process, the 3(b) meet and confer process, and the 3(c) memorandum of mutual understanding process.  See Sections 5(c) through 5(g).  Section 6 of the Executive Order is entitled “Cooperation with Commonwealth Agencies.”  Section 7 of the Executive Order is entitled “Effect and Duration.”

During the litigation, Governor Wolf and the Department took steps to implement the Executive Order.  To date, AAA certified United Home Care Workers of Pennsylvania, LLC (UHCWP) as the Designated Representative.  See June Stipulation, dated 6/3/15.  UHCWP won the election based on 2,663 votes out of 20,000 DCWs.  UHCWP is comprised of two employee organizations, Service

13

Employees International Union (SEIU) and the American Federation of State, County and Municipal Employees. UHCWP then requested and received a copy of the DCW List, to which it distributed brochures encouraging membership.[5]

## C. Procedural History

Petitioners filed a petition for review challenging the validity of the Executive Order. They seek declaratory and injunctive relief from its terms, asserting Governor Wolf exceeded his authority in issuing it. Petitioners also argue the Executive Order conflicts with both the Pennsylvania Labor Relations Act[6] (PLRA) and the Public Employe Relations Act[7] (PERA).

Petitioners also sought preliminary injunctive relief before an election of a DCW representative, and to prevent implementation of the Executive Order.

Petitioners claim the Executive Order interferes with the unique relationship between DCWs and participants that occur in participants' homes. Jesse Charles and Victoria Markham are participants as defined in the Executive Order. Jessica Markham is a DCW who provides home care services to her mother, Victoria Markham. PHA and UCP are nonprofit membership corporations (collectively, Associations) comprised of provider members who employ DCWs under the Agency Model.

---

[5] The title of one such brochure was "20,000 Pennsylvania Home Care Attendants Are Joining Together." The mailings referred to the selection of UHCWP as a union election.

[6] Act of June 1, 1937, P.L. 1168, as amended, 43 P.S. §§211.1-.13.

[7] Act of July 23, 1970, P.L. 563, as amended, 43 P.S. §§1101.101-.2301.

14

Respondents filed preliminary objections in the nature of a demurrer, also asserting Petitioners' claims are not ripe, and the Associations lack standing.

Petitioners filed an application to expedite their petition in the nature of preliminary relief, which this Court granted. The parties entered stipulations in April 2015 (April Stipulation) prior to the preliminary injunction hearing. After granting their application to expedite, then President Judge Dan Pellegrini heard Petitioners' request for preliminary injunction. He issued an order enjoining Respondents from entering a MOU pending disposition of the merits. He also ordered the parties to file applications for summary relief.

Prior to filing their applications for summary relief, the parties entered a second stipulation in June 2015 (June Stipulation).

The Senate Republican Caucus[8] filed an application to intervene aligned with Petitioners' interests, which this Court denied in a single judge opinion. Our Supreme Court affirmed the denial of intervention on interlocutory appeal. Markham v. Wolf, 136 A.3d 134 (Pa. 2016) (addressing applications to intervene in 176 M.D. 2015 and 177 M.D. 2015). The Senate Republican Caucus and the Senate Democratic Caucus, as well as a number of other entities and individuals, filed friend-of-the court briefs.

---

[8] On April 20, 2015, Senate President Pro Tempore Joseph Scarnati, III, Senate Majority Leader Jake Corman, Senate Majority Whip John Gordner, and Senate Majority Appropriations Chairman Pat Browne, filed the application on behalf of the Senate Republican Caucus.

15

Petitioners and Respondents both filed applications for summary relief pursuant to Pa. R.A.P. 1532(b). After briefing and oral argument, the parties' cross-applications for summary relief are ready for disposition.

## II. Discussion

### A. Legal Standards

Applications for summary relief are governed by Pa. R.A.P. 1532(b). It provides: "[a]t any time after the filing of a petition for review in an … original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Id. "An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." Leach v. Turzai, et al., 118 A.3d 1271, 1277 n.5 (Pa. Cmwlth. 2015) (en banc), aff'd, 141 A.3d 426 (Pa. 2016) (citing Hosp. & Healthsystem Ass'n of Pa. v. Com., 77 A.3d 587 (Pa. 2013)). "In ruling on application[s] for summary relief, we must view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there is no genuine issue as to any material facts and the right to judgment is clear as a matter of law." Cent. Dauphin Sch. Dist. v. Dep't of Educ., 598 A.2d 1364, 1366-67 (Pa. Cmwlth. 1991); see Leach.

As to preliminary objections in the nature of a demurrer, we may sustain preliminary objections only when, based on the facts pled, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief. Mazur v. Trinity Area Sch. Dist., 961 A.2d 96 (Pa. 2008). For the purpose of evaluating the legal sufficiency of the challenged pleading, this

16

Court must accept as true all well-pled, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts. Leach.

The purpose of the Declaratory Judgments Act "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa. C.S. §7541. Declaratory judgment as to the rights, status or legal relationships is appropriate only where there exists an actual controversy. McCord v. Pennsylvanians for Union Reform, 136 A.3d 1055 (Pa. Cmwlth. 2016). "An actual controversy exists when litigation is both imminent and inevitable and the declaration sought will practically help to end the controversy between the parties." Id. at 1061 (quotation omitted). "Granting or denying a petition for a declaratory judgment is committed to the sound discretion of a court of original jurisdiction." GTECH Corp. v. Dep't of Revenue, 965 A.2d 1276, 1285 (Pa. Cmwlth. 2009).

"To prevail on a claim for a permanent injunction, the plaintiff must establish a clear right to relief, that there is an urgent necessity to avoid an injury which cannot be compensated for by damages, and that greater injury will result from refusing rather than granting the relief requested." Watts v. Manheim Twp. Sch. Dist., 84 A.3d 378, 390 (Pa. Cmwlth. 2014). A violation of statute constitutes irreparable harm. Pa. Pub. Util. Comm'n v. Israel, 52 A.2d 317 (Pa. 1947).

17

## B. Contentions

Petitioners allege the Executive Order interferes with the participant-DCW employment relationship under Act 150, and establishes organizational labor rights for DCWs. They also contend Governor Wolf exceeded his authority in issuing the Executive Order because it does not implement or enforce existing law. Rather, the Executive Order creates rights that are inconsistent with existing law.

Respondents counter "the Executive Order is merely a tool for the [Department] and the Governor to efficiently get information from those who provide important services to some of our most vulnerable Pennsylvanians with the ultimate goal of providing better services." Resp'ts' Br. at 3. Respondents thus identify information gathering as its primary purpose. Respondents also allege the Executive Order is a valid exercise of Governor Wolf's executive power "to communicate with subordinate officials in the nature of request or suggested directions for the execution of the duties of the Executive Branch of government." Resp'ts' Answer with New Matter, at ¶2. Yet, Respondents do not cite any statute or specify any executive power the Executive Order is designed to implement or enforce.

## C. Analysis

### 1. Preliminary Objections: Standing and Ripeness

At the outset, we evaluate Respondents' challenge to Petitioners' standing and the ripeness of their claims. Contrary to Respondents' view, we find Petitioners are directly impacted by the Executive Order.

In denying legislative standing to Senators of the Majority Caucus, our Supreme Court reasoned, "challengers exist who are, from a standing perspective, sufficiently impacted by the Governor's issuance of [Executive Order], as amply demonstrated by the parties in this matter who include patients, [DCWs] and institutional health care providers." Markham, 136 A.3d at 146. We agree with our Supreme Court that participants in the Home Care Programs and providers of home care services have standing.

Here, individual Petitioners have an interest in the litigation that is substantial, direct and immediate, and not a remote consequence of the challenged action.[9] Pa. Acad. of Chiro. Physicians v. Dep't of State, Bureau of Prof'l & Occ. Affairs, 564 A.2d 551 (Pa. Cmwlth. 1989). Petitioners allege the Executive Order interferes in the unique employment relationship between DCWs and participants, undermining participants' ability to control their care. As participants, Jesse Charles and Victoria Markham employ DCWs. The Commonwealth has no employer-employee relationship with DCWs. April Stip. ¶7. However, Section 3 of the Executive Order includes the Commonwealth, but excludes the actual employer participants from the meet and confer process, which is designed to result in decisions impacting terms and conditions of employment. Jessica

---

[9] Our Supreme Court explains the criteria for standing as follows:

> [A] 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A 'direct' interest requires a showing that the matter complained of caused harm to the party's interest. An 'immediate' interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it ….

S. Whitehall Twp. Police Serv. v. S. Whitehall Twp., 555 A.2d 793, 795 (Pa. 1989).

Markham, as a DCW whose interests are to be served by a Designated Representative, has a direct interest in protecting herself from an invasion of privacy in her home through mailings for the purpose of solicitation, and from selection of a representative based on a bare majority vote. These interests are greater than that of the general public. Therefore, individual Petitioners, Jessica and Victoria Markham and Jesse Charles establish standing.

So long as one of the petitioners has standing, an action may continue. Pennsylvanians Against Gambling Expansion Fund, Inc. v. Com., 877 A.2d 383 (Pa. 2005). Because the individual Petitioners have standing, it is unnecessary to address whether the Associations have standing. Id.

As to Respondents' objection that Petitioners anticipate a harm that may never occur, we emphasize this is an action for a declaratory judgment. The Declaratory Judgments Act is "remedial[;] [i]ts purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations, and is to be liberally construed and administered." 42 Pa. C.S. §7541(a). Thus, lack of a present harm is not fatal to a declaratory judgment claim. Pa. Social Servs. Union, Local No. 668, SEIU v. Com., 530 A.2d 962 (Pa. Cmwlth. 1987).

Regardless, Petitioners allege non-speculative harm in that the Executive Order interferes with the relationship between a DCW and a participant in the participant's home. Section 3 of the Executive Order excludes participants from the meet and confer process designed to negotiate terms and conditions of employment. The Executive Order further disturbs the employment relationship by

20

introducing the Designated Representative to purportedly represent the interests of DCWs regarding terms and conditions, and discuss these issues with the Department. The Executive Order also fosters collectivization by creating a process for electing a representative, and encouraging employee organizations to solicit DCWs for membership. An election occurred, and UHCWP was selected. Contrary to Respondents' characterization, Petitioners' injury is not confined to entering a MOU that may never occur.

These are concrete events that may be addressed through the courts, and do not call for an advisory opinion. Rendell v. State Ethics Comm'n, 983 A.2d 708 (Pa. 2009). For these reasons, we overrule Respondents' preliminary objections related to standing and ripeness.

Turning to the merits, we examine the validity of the Executive Order.

## 2. Substantive Claims
### a. Executive Power

Article IV, Section 2, of the Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." PA. CONST. art. IV, §2. Separation of powers into the legislative, executive, and judicial branches is the foundation underlying our Constitution. Commonwealth v. Mockaitis, 834 A.2d 488 (Pa. 2003). Pursuant to the separation of powers doctrine, the executive branch is prohibited from exercising the functions exclusively committed to another branch. Id.

21

"The Governor's power is to execute the laws[,] and not to create or interpret them." Arneson v. Wolf, 117 A.3d 374, 391 (Pa. Cmwlth.) (en banc), aff'd, 124 A.3d 1225 (Pa. 2015) (quotation omitted). "The Legislative Branch of government creates laws, and the Judicial Branch interprets them." Shapp v. Butera, 348 A.2d 910, 914 (Pa. Cmwlth. 1975) (en banc). The Governor has that power which is delegated to him by law, or which may be necessarily implied from his executive duties. Id. As such, the Governor may issue executive orders in accordance with that power. Id. "In no event, however, may any executive order be contrary to any constitutional or statutory provision, nor may it reverse, countermand, interfere with, or be contrary to any final decision or order of any court." Schuylkill Prods., Inc. v. Dep't of Transp., 962 A.2d 1249, 1254 (Pa. Cmwlth. 2008) (quoting Cutler v. State Civil Serv. Comm'n, 924 A.2d 706, 711 (Pa. Cmwlth. 2007)).

In Shapp, this Court outlined the confines of a Governor's authority to issue executive orders. We classified executive orders into three types: (1) proclamations for a ceremonial purpose;[10] (2) directives to subordinate officials for the execution of the duties of the Executive Branch of government; and, (3) implementation of a statute or other law. Only the third type of executive orders is legally enforceable. Id.

Respondents contend the Executive Order is permitted under the second category of orders, as a directive to subordinates, like the order in Shapp. We reject this contention.

---

[10] The parties agree the Executive Order does not fall within the first category as a proclamation. An example of such an order is one directing that all flags be flown at half-mast to honor a fallen soldier.

22

In Shapp, the executive order at issue requested certain members of the Governor's staff to file financial disclosure statements (Shapp Order). In analyzing whether the financial disclosure statements qualified as "public records" under the then Right-to-Know Law,[11] we assessed whether the executive order affected legal rights or duties. This Court determined the executive order did not fix rights or duties because it was voluntary. The only penalty for noncompliance was "a possible removal from office, an official demotion, restrictions on responsibilities, a reprimand or a loss of favor." Id. at 913. As a result, we concluded the Shapp Order constituted a "communication with subordinate officials in the nature of requests or suggested directions for the execution of the duties of the Executive Branch." Id. As such, the Shapp Order fell within the second category of permissible executive orders.

In this context, a "subordinate" is "subject to the authority or control of another …." AM. HERITAGE DICTIONARY 1212 (2nd Coll. ed. 1985); see Appeal of Hartranft, 85 Pa. 433 (1878). A subordinate of the Governor is considered his legal agent authorized to act on his behalf. Id. at 444 (addressing power to subpoena Governor and his subordinates "who are employed to render these powers [with which he is clothed] efficient"); Opie v. Glascow Inc., 375 A.2d 396, 398 (Pa. Cmwlth. 1977) (explaining government employees, as distinguished from officers, "merely exercise subordinate ministerial functions" under supervision).

Considering applicability of the second category to the Executive Order here, we consider its terms. Section 2 establishes a new body, the Advisory

---

[11] Act of June 21, 1957, P.L. 390, formerly 65 P.S. §§66.1-66.9, repealed by, Section 3102 of the Right-to-Know Law, Act of February 14, 2008, P.L. 6, 65 P.S. §67.3102.

Group, comprised of the Secretary and Deputy Secretary of the Department, with remaining members appointed by the Governor. Its purpose is to ensure the quality of home care services under the Participant Model. Its function is advisory only, and consists of policy-making. The Advisory Group is required to review and assess policies from a best practices perspective. This portion of the Executive Order arguably involves a directive to subordinates to gather information.

However, we conclude that Sections 3 and 4 of the Executive Order are not permissible executive actions under the second category. There are several reasons for this conclusion. First and foremost, factual differences between the current Executive Order and the Shapp Order render the Shapp case inapposite. In both function and phrasing, the executive orders are not comparable.

The primary difference is that of scope. The Shapp Order consisted of a communication, in the form of a discrete request, to existing subordinates. Specifically, the Shapp Order used the word "requesting" when it asked members of the Executive Branch to disclose their financial interests. By contrast, the Executive Order mandates actions by the Secretary and Deputy Secretary, as well as by third parties and the newly created role of Designated Representative. See E.O. Section 3 "The Secretary shall recognize a [Designated Representative] ….;" "[T]he Secretary shall designate [AAA] ….;" "The [Designated Representative] shall continue to act as such …." Accordingly, the Executive Order creates rights and duties. It does not set forth voluntary activities as in the Shapp Order. Also unlike the Shapp Order, the Executive Order creates a multi-part process, involving many non-subordinates

24

in critical roles. The Shapp Order did not create new bodies or positions of influence, or direct action by anyone other than subordinates in the Executive Branch.

Second, from our careful reading, we conclude Sections 3 and 4 of the Executive Order do not merely direct subordinates. Rather, Sections 3 and 4 alter the employment relationship between DCWs and participants that occurs in a participant's home. This is accomplished by inserting the Department and DCW Representative into that relationship, with the goal of negotiating terms and conditions of employment without input by participants. DCWs are not subordinates of the Governor. UHCWP, the Designated Representative, is not a subordinate of the Governor. AAA is also not a subordinate of the Governor. Notwithstanding their status as non-subordinates, the Executive Order directs these providers and entities as part of the election, collectivization and bargaining process it creates.

Third, we are also unconvinced that Sections 3 and 4 of the Executive Order are merely a means of information gathering as Respondents assert. Indeed, information gathering is not mentioned. No part of Section 3, comprised of the election process, meet and confer process and MOU, consists of information gathering. Section 4 involves compilation of the DCW List, to enable an employee organization's representation as set forth in Section 3. Respondents do not persuasively explain why Sections 3 and 4, which do not involve any participant input, are primarily information gathering, as opposed to collective bargaining.

25

Fourth, Respondents do not explain why the Section 2 Advisory Group is inadequate for information gathering. Stated differently, Respondents do not identify information that can only be gathered through the "meet and confer" sessions, which include the Department and the Designated Representative, but exclude participants.

For all these reasons, we determine that Sections 3 and 4 of the Executive Order are not truly a means of providing information to Governor Wolf to assist Respondents in assessing quality of home care services.

Having determined that Sections 3 and 4 of the Executive Order do not fall within the second category of authorized executive orders, we consider whether the Executive Order is otherwise authorized under Shapp.

### b. Enforcing or Implementing Existing Law

Executive orders that qualify under the third category of executive orders are designed to implement or enforce a statute or other law. Id. Executive orders falling under this category are either specifically authorized, by statute or constitutional provision, or are necessarily implied from executive duties. Id.

Respondents cite no specific authority enabling the Executive Order. Further, we discern no authority that either specifically authorizes the Executive Order, or necessitates its issuance so Governor Wolf may perform his duties.

26

Petitioners argue the Executive Order creates new entities and processes that are inconsistent with legislative policy. They assert that through the Executive Order Governor Wolf does not enforce or implement existing law; rather, he exceeds his authority because the Executive Order *makes* law, a power reserved to the legislative branch.

Pursuant to Shapp, no executive order may "be contrary to any constitutional or statutory provision." Id. at 914. We examine Petitioners' contention that the Executive Order conflicts with the PLRA and PERA by granting collective bargaining rights to DCWs.

### i. PLRA, NLRA and PERA

The PLRA is Pennsylvania's analog to the National Labor Relations Act (NLRA), 29 U.S.C. §§151-169, setting forth an employee's rights. The PLRA allows defined employees to collectively bargain through an exclusive representative. Specifically, Section 5 of the PLRA permits employees to organize, including forming or joining a labor organization, to collectively bargain, and to engage in activities for the purposes of collective bargaining. 43 P.S. §211.5.

Relevant here, DCWs are expressly excluded from the definition of employee in Section 3 of the PLRA. 43 P.S. §211.3. It provides:

> [t]he term 'employe' shall include any employe, and shall not be limited to the employes of a particular employer, unless the act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute, or because of any unfair labor practice, and who has not obtained any other regular and

27

substantially equivalent employment, but <u>shall not include any individual employed</u> as an agricultural laborer, or <u>in the domestic service of any person in the home of such person</u>, or any individual employed by his parent or spouse.

<u>Id.</u> (emphasis added).

DCWs provide in-home personal care services. The clear policy decision by the General Assembly was to preclude the reach of collective bargaining to domestic service rendered to a person in his or her home. This policy choice, which is consistent with the long-standing "home as castle" trope in law and custom, is binding. It cannot be altered by executive order.

Further, PERA, which grants *public* employees the right to unionize, also does not confer collective bargaining rights on DCWs. DCWs are not Commonwealth employees; their employers are participants who are private parties. April Stip. ¶7.

Despite the definitional exclusion of DCWs from the PLRA and PERA, the terminology in Section 3 of the Executive Order is similar to the terminology contained in collective bargaining statutes, as discussed immediately hereafter.

### ii. Representative Election and Designation

The Executive Order provides an election and designation process for selecting the Designated Representative. It provides "[t]here shall only be one [DCW] Representative recognized at any time." E.O. at 5. Thus, the Designated

Representative is the exclusive representative for all DCWs, and the Secretary shall only recognize one Designated Representative.

Under the PLRA, the chosen representative "shall be the exclusive representative of all the employees … for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." Section 7 of the PLRA, 43 P.S. §211.7(a) (emphasis added). Under PERA, the chosen representative "shall be the exclusive representative of all the employes … to bargain on wages, hours, terms and conditions of employment." Section 606 of PERA, 43 P.S. §1101.606.

### iii. Meet and Confer

The Executive Order provides the Secretary, the Deputy Secretary and the Designated Representative "shall meet and confer" regarding terms and conditions of employment, including recruitment, wages, benefits, payment procedures and voluntary deductions, and training. E.O. at 5. Although the parties are not compelled to reach mutual understandings, any "[m]utual understandings reached during the meet and confer process shall be reduced to writing." Id.

PERA obligates the public employer and the employee representative to "meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment …." Section 701 of PERA, 43 P.S. §1101.701 (emphasis added). Once an agreement is reached, it "shall be reduced to writing and signed by the parties." Section 901 of PERA, 43 P.S. §1101.901.

29

The NLRA explains collective bargaining as follows: "[t]o bargain collectively is the performance of the <u>mutual obligation</u> of the employer and the representative of the employees <u>to meet</u> at reasonable times <u>and confer</u> in good faith with respect to wages, hours, and other terms and conditions of employment …." Section 8(d) of the NLRA, 29 U.S.C. §158(d) (emphasis added).

Our review of statutes governing organized labor reveals the incongruence between the statutes and the Executive Order. By excluding DCWs from the definition of employees in the PLRA, the General Assembly chose to deny DCWs the ability to collectively bargain. By issuing the Executive Order, and encouraging DCWs' to organize collectively, Governor Wolf is essentially usurping that legislative power. <u>See</u> <u>Nat'l Solid Wastes Mgmt. Ass'n v. Casey</u>, 600 A.2d 260 (Pa. Cmwlth. 1991).

### iv. 2010 Rendell Order

Significantly, the Executive Order bears striking similarities to an executive order Governor Edward Rendell issued in 2010 that pertained to DCWs (Rendell Order). Like the Executive Order here, the Rendell Order: created a process for organizing DCWs, including election of a union representative; established an advisory council regarding participant care; created a list of DCWs; and, authorized negotiations between the Department and the elected union representative. Also like the Executive Order, the Rendell Order did not mandate the parties reach an agreement. However, if the mandatory negotiations led to an agreement, the Rendell Order required any mutual understanding to be put in writing.

30

Similar to the present litigation, the participants and DCWs challenged the Rendell Order as an invalid abuse of executive power and sought to enjoin its implementation. See Pa. Homecare Assoc., et al. v. Rendell, et al. (Pa. Cmwlth., No. 776 M.D. 2010, filed October 28, 2010) (single j. op.) (unreported).[12] This Court, through Senior Judge Keith B. Quigley, issued a preliminary injunction precluding implementation or enforcement of the Rendell Order.

In its opinion granting preliminary injunctive relief, this Court reasoned the petitioners showed a clear right to relief in that the Rendell Order was inconsistent with the PLRA by permitting DCWs to organize collectively. Essentially, election of one exclusive DCW representative under the Rendell Order to represent DCW-employee interests in negotiations with the Commonwealth regarding terms and conditions of employment allowed collective bargaining.

In terms of function, this Court recognized that any agreement resulting from the mandatory negotiations qualified as a collective bargaining agreement. Further, the Court noted that while DCWs were not Commonwealth employees, the agreement purported to create an employment relationship whereby the Commonwealth became the *de facto* employer. Id., slip op. at n.10.

Applying the persuasive Rendell Order reasoning to this case, we recognize that the current Executive Order's requirement that an employee organization and the Department meet and confer is the essence of collective

---

[12] Pursuant to Section 414(b) of this Court's Internal Operating Procedures, a single-judge opinion shall be cited only for its persuasive value.

31

bargaining. Indeed, the "meet and confer" phrasing in the NLRA and PERA mirrors that of the Executive Order. We conclude the Executive Order in effect grants collective bargaining rights to DCWs by empowering a Designated Representative as their exclusive representative.

Further, participants, the actual employers, are excluded from the meet and confer process, and there is no provision for their input. By excluding participants, yet addressing terms and conditions of employment to which participants as employers may be subject, the Executive Order impairs participants' rights to control personal care rendered to them in their own homes.

### v. Section 5 Disclaimers

The self-serving disclaimers in Section 5 of the Executive Order do not save it from invalidity, for several reasons.[13] First, we are guided by the nature of the relationship, not the terms used to describe it. See, e.g., Schneider Nat'l Carriers v. Workers' Comp. Appeal Bd. (Baerdon), 738 A.2d 53 (Pa. Cmwlth. 1999) (independent contractor agreement is not dispositive; court may discern employment relationship from other factors). The Executive Order grants rights to DCWs to organize and select an exclusive representative to negotiate terms and conditions of employment. Meet and confer sessions are collective bargaining, and any agreement reached between the Department and UHCWP is a collective bargaining agreement. In this manner, Governor Wolf establishes rights and duties contrary to existing legislation. Casey.

---

[13] "[T]his Executive Order shall not be construed or interpreted to create collective bargaining rights or a collective bargaining agreement under federal or state law." E.O. at 6.

Second, the doctrine of separation of powers precludes the executive from directing or constraining a judicial function. Interpretation of official language to determine the legal effects of the language is a judicial function. While the executive can express his intent, he cannot direct how the judiciary shall interpret a legal document. This is especially true where, as here, there are operative provisions which contradict the claimed intent. Shapp, 348 A.2d at 914 ("the Executive Branch, through executive orders, is not permitted … to usurp the judicial prerogative to interpret [the law]. If such power was granted, those interpretations would be subject to change at least every four years, and the law would be filled with uncertainty.").

### vi. Severability

Next, we consider whether the Executive Order is capable of separation under the doctrine of severability. Saulsbury v. Bethlehem Steel Co., 196 A.2d 664, 666 (Pa. 1964) ("a statute or ordinance may be partially valid and partially invalid, and … if the provisions are distinct and not so interwoven as to be inseparable … courts should sustain the valid portions").

Unlike Section 3, Section 2 of the Executive Order does not implicate collective bargaining or impose requirements in conflict with existing rights and duties. The Section 2 Advisory Group holds an advisory role only, designed to assist the Executive Branch in implementing the Home Care Programs under Act 150 and Medicaid waiver programs. As such, we are persuaded that Section 2 of the Executive Order falls within Governor Wolf's sphere of executive authority.

33

However, Section 4 (DCW List) is expressly integral to the election process set forth in Section 3(a), and thus depends on Section 3(a) for its operation. Therefore, Section 4 is not severable from Section 3. Similarly, those portions of Sections 1 and 5 derived from Section 3 are so interwoven with the invalid provisions so as to be non-severable and incapable of operation. Id.; see also Robinson Twp., Washington Cnty. v. Com., 83 A.3d 901 (Pa. 2013).

Applying the severability principle, we conclude that Section 2 of the Executive Order is self-sustaining. Therefore, we grant Respondents' application for summary relief as to Section 2, and we uphold its validity.

### vii. Summary

Governor Wolf exceeded his authority in issuing Sections 3 and 4 of the Executive Order. Most of the Executive Order does not merely implement or enforce existing law, so as to be authorized under the third category of executive orders in Shapp. Instead, the Executive Order is *de facto* legislation, with provisions contrary to the existing statutory scheme. Casey. At its core, the Executive Order invades the relationship between a DCW and the employer participant who receives personal services in his or her home. For these and the above reasons, we declare Sections 3 and 4, and related Sections 1(d) and (e), and 5(b) through (g), of the Executive Order invalid.[14]

---

[14] As we declare Section 4 of the Executive Order an invalid exercise of executive authority, we need not address the alleged privacy interest in precluding solicitation of DCWs on the DCW List.

### III. Conclusion

For the foregoing reasons, we grant Petitioners' application for summary relief in part, and we declare Sections 3 and 4 of the Executive Order invalid and void. Parts of Section 1 (definitions of DCW List and Direct Care Worker Representative) are also invalid. <u>See</u> E.O. Sections 1(d) and (e). Further, parts of Section 5 which expressly refer to new relationships that may arise by operation of Sections 3 and 4, including any references to a MOU, are also invalid. <u>See</u> E.O. Sections 5(b) through 5(g). Respondents are enjoined from enforcing those related sections of the Executive Order or taking any actions in accordance with those sections of the Executive Order. <u>Israel</u>. Conversely, we deny Respondents' application for summary relief in part as to Sections 1(d) and (e), 3, 4, and Sections 5(b) through 5(g) of the Executive Order.

As a result of the foregoing, Respondents' preliminary objections in the nature of a demurrer are rendered moot. <u>See</u> <u>Leach</u>. We overrule Respondents' preliminary objections challenging Petitioners' aggrievement.

_____
ROBERT SIMPSON, Judge

Judge Covey did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jessica Markham, Victoria Markham, :
Jesse Charles, Pennsylvania Homecare :
Association, United Cerebral Palsy of :
Pennsylvania, :
      Petitioners :
         :
   v.     : No. 176 M.D. 2015
         :
Thomas W. Wolf, in his Official :
Capacity as Governor of the :
Commonwealth of Pennsylvania, :
Department of Human Services, :
Office of Long Term Living, :
      Respondents :

# O R D E R

**AND NOW**, this 22ⁿᵈ day of September, 2016, Petitioners' Application for Summary Relief pursuant to Pa. R.A.P. 1532(b) is **GRANTED in PART**, only as to Sections 1(d) and (e), 3, 4, and Sections 5(b) through 5(g) of Executive Order 2015-05; and **JUDGMENT** is entered in their favor as to those sections and subsections only. Respondents' Application for Summary Relief is **DENIED in PART** as to Sections 1(d) and (e), 3, 4, and Sections 5(b) through 5(g) of Executive Order 2015-05, and **GRANTED** as to other provisions.

Sections 1(d) and (e), 3, 4, and 5(b) through (g) of Executive Order 2015-05 are hereby declared **INVALID**, and any past actions taken pursuant to those sections are declared **VOID ab INITIO**. Respondents are **ENJOINED** from prospectively enforcing those sections of Executive Order 2015-05, or taking any future actions in accordance with those sections.

**AND FURTHER**, Respondents' preliminary objection to the ripeness of Petitioners' claims is **OVERRULED** for the reasons set forth in the foregoing opinion. Respondents' preliminary objections in the nature of a demurrer are **DISMISSED** as **MOOT**.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jessica Markham, Victoria     :
Markham, Jesse Charles,     : No. 176 M.D. 2015
Pennsylvania Homecare     : Argued: June 8, 2016
Association, United Cerebral     :
Palsy of Pennsylvania,     :
     :
              Petitioners   :
     :
          v.        :
     :
Thomas W. Wolf, in his Official     :
Capacity as Governor of the     :
Commonwealth of Pennsylvania,     :
Department of Human Services,     :
Office of Long Term Living,     :
     :
             Respondents   :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge

DISSENTING OPINION
BY JUDGE WOJCIK            FILED: September 22, 2016


       I respectfully dissent. The well-written majority opinion disposing of

the parties' applications for summary relief[1] and Respondents' preliminary

---

[1] This Court may grant summary relief if the applicant's right to judgment is clear and no material issues of fact are in dispute. Pa. R.A.P. 1532(b); *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008).

objections in the nature of demurrer[2] is based upon the premise that direct care workers (DCWs) are employed in "domestic service," and thus are not "employees" eligible to collectively bargain under Section 3 of the Pennsylvania Labor Relations Act (PLRA).[3]   However, whether DCWs are employed in "domestic service" is a legal determination that cannot be made at this juncture in the absence of a developed factual record, which has yet to occur.  *See Dutrow v. Workers' Compensation Appeal Board (Heckard's Catering)*, 632 A.2d 950, 952 (Pa. Cmwlth. 1993) (legal determination as to whether a claimant was employed in "domestic service" was based on factual record).

As the majority sets forth, the PLRA is Pennsylvania's analog to the National Labor Relations Act (NLRA), 29 U.S.C. §§151-169.  Both the PLRA and the NLRA authorize "employees" to self-organize, to form, join or assist labor organizations, to collectively bargain, and to engage in activities for the purposes of collective bargaining.  Section 5 of the PLRA, 43 P.S. §211.5; 29 U.S.C. §157.

However, both the PLRA and NLRA exclude individuals employed in "domestic service" from the term "employee."  Specifically, Section 3(d) of the PLRA provides:

> **The term 'employe'** shall include any employe, and shall not be limited to the employes of a particular employer, unless the act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute, or because of any unfair labor practice, and who

---

[2] When ruling on preliminary objections in nature of demurrer, this Court is not required to accept as true any unwarranted factual inferences, conclusions of law, or expressions of opinion.  *Guarrasi v. Scott*, 25 A.3d 394, 400 n.5 (Pa. Cmwlth. 2011).

[3] Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. §211.3.

has not obtained any other regular and substantially equivalent employment, **but shall not include any individual employed** as an agricultural laborer, or **in the domestic service of any person in the home of such person**, or any individual employed by his parent or spouse.

43 P.S. §211.3 (emphasis added).[4]

However, the PLRA does not define "domestic service." When words of a statute are undefined, they must be construed in accordance with their common and approved usage. Section 1903(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. §1903(a); *Adams Outdoor Advertising, L.P. v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469 (Pa. Cmwlth. 2006). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor*, 909 A.2d at 483; *see THW Group, LLC v. Zoning Board of Adjustment*, 86 A.3d 330 (Pa. Cmwlth.), *appeal denied*, 101 A.3d 788 (Pa. 2014).

---

[4] Similarly, Section 152(3) of the NLRA provides:

> The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, **but shall not include any individual employed** as an agricultural laborer, or **in the domestic service of any family or person at his home** . . . .

29 U.S.C. §152(3) (emphasis added).

Pennsylvania courts have examined the term "domestic service" in other labor and employment contexts. For instance, Section 321 of the Workers' Compensation Act (Act)[5] excludes persons engaged in "domestic service" from provisions of the Act. This Court interpreted "domestic service" as work that "serves the needs of a household." *Dutrow*, 632 A.2d at 952 (citing *Viola v. Workmen's Compensation Appeal Board (Welch)*, 549 A.2d 1367, 1369 (Pa. Cmwlth. 1988)). In *Viola*, the claimant was hired to care for her employer's invalid wife. Her job duties entailed administering medication, feeding, bathing and dressing the employer's wife, and helping her in and out of bed. We determined the claimant did not serve, nor was she employed to serve, the needs of the household. Rather, her role related to the personal care and specialized medical needs of the employer's wife, not performing household duties. Because the claimant's job duties were more akin to those of a nurse's aide, and did not involve the performance of household duties, we concluded the claimant was not engaged in "domestic service" for workers' compensation purposes. 549 A.2d at 1369; *cf. Dutrow* (baby-sitting constituted "domestic service" because it served the needs of the household, not just the needs of the child).

In *Jack v. Belin's Estate*, 27 A.2d 455, 457 (Pa. Super. 1942), our Superior Court held the gardener of a household estate was engaged in domestic service for purposes of the Act. The Court explained that domestic service contributes to the personal needs and comfort of the employer, as opposed to an enterprise for profit. The Court continued:

> Cooks and house maids are domestic servants, not because they work indoors, *but because they serve the*

---

[5] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §676.

> *needs of the household*. Similarly, one who drives an automobile in bringing supplies from market or in disposing of waste materials or who raises vegetables and produce for use on the estate is a domestic servant in the broader sense contemplated by the [Workers' Compensation] Act. Growing flowers for the delight and pleasure of the family of the owners is the same kind of service.

*Jack*, 27 A.2d at 457 (emphasis added).

Similar to the Act, the Pennsylvania Minimum Wage Act of 1968 (MWA)[6] also exempts employment for "[d]omestic services in or about the private home of the employer" from the statute's minimum wage and overtime requirements. Section 5(a)(2) of the MWA, 43 P.S. §333.105(a)(2). The regulation defining "domestic services" provides:

> Work in or about a private dwelling for an employer in his capacity as a householder, as distinguished from work in or about a private dwelling for such employer in the employer's pursuit of a trade, occupation, profession, enterprise or vocation.

34 Pa. Code §231.1(b).

In *Bayada Nurses, Inc. v. Department of Labor and Industries*, 8 A.3d 866, 883 (Pa. 2010), the Supreme Court was asked to interpret the "domestic services" exemption of the MWA's overtime provisions. The Court observed that the language of the MWA is consistent with the same exemption provided in Section 213(a)(5) of the federal Fair Labor Standards Act (FLSA), 29 U.S.C. §213(a)(15), which does not prohibit an exemption for agency employment. The healthcare provider argued the two statutes should be interpreted *in pari materia*, and that the federal approach should govern, permitting agency employers to

---

[6] Act of January 17, 1968, P.L. 11, *as amended,* 43 P.S. §§ 333.101-333.115.

benefit from the domestic services exemption. The Court disagreed. Although the MWA and FSLA contain nearly identical exemption language, the Court explained the federal exemption relating to "domestic services" was more expansive than the state regulation. *Id.* at 871, 877-78. The Court ruled that the state exemption was only meant to cover individuals directly employed by the householder, not those who were employed by third party agencies. *Id.* at 883. The Court held the FLSA does not supersede state law and Pennsylvania may enact and impose more generous overtime provisions than those contained under the FLSA. *Id.* Thus, the Court rejected the argument that the domestic services exemption in the MWA should be construed *in pari materia* with the FLSA. *Id.*

Similarly, in *Blue Mountain Mushroom Company, Inc. v. Pennsylvania Labor Relations Board*, 735 A.2d 742, 748 (Pa. Cmwlth. 1999), *appeal denied*, 785 A.2d 91 (Pa. 2001), this Court rejected the notion that, because the PLRA was patterned after the NLRA, Pennsylvania courts must adhere to federal interpretation. There, we examined whether the term "agricultural laborer" pertained to mushroom workers. "Agricultural laborers," like domestic service workers, are excluded from the definition of employee under both the PLRA and the NLRA. 43 P.S. §211.3; 29 U.S.C. §152(3). Although mushroom workers were historically considered horticultural workers, in 1947, Congress directed the National Labor Relations Board (NLRB) to follow the FLSA's definition of "agriculture," which included the production, cultivation, growing and harvesting of horticultural commodities. *Blue Mountain*, 735 A.2d at 747 (citing 29 U.S.C. §203(f)). Notwithstanding, Pennsylvania was not constrained to follow the NLRB in redefining the term "employee" to include mushroom workers absent direction by the General Assembly. In Pennsylvania, mushroom production is considered

horticultural, not agricultural. *Id.* Consequently, mushroom workers are "employees," not "agricultural laborers," for purposes of the PLRA. *Id.*

To date, there has been no statutory or regulatory expansion of the term "domestic service" under the PLRA to include personal care services, such as nurses, home health aides or personal care aides. *But cf.* 29 C.F.R. §552.3 (federal regulation under the FLSA now includes "nurses," "home health aides" and "personal care aides" in the definition of "domestic service employment").[7] Pennsylvania courts have not included personal care services in its interpretation of the term "domestic service" in other labor contexts. *See Dutrow; Viola.*

According to Governor Thomas W. Wolf's Executive Order, No. 2015-05 (Executive Order), DCWs are individuals who provide "Participant-Directed Services," which include:

> personal assistance services, respite . . . or similar types of services provided to a senior or a person with a disability who requires assistance . . . to meet such person's daily living need, (ii) ensure such person may adequately function in such person's home, and (iii) provide such person with safe access to the community.

---

[7] The definition of "domestic service employment" contained in Section 552.3 is derived from the regulations under the Social Security Act (20 C.F.R. §404.1057). 29 C.F.R. §552.101. Prior to its amendment in January 2015, Section 552.3 closely mirrored the Social Security Act regulation, which defines "domestic service" as "services of a household nature in or about a private home include services performed by cooks, waiters, butlers, housekeepers, governesses, maids, valets, baby sitters, janitors, laundresses, furnace men, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use." 20 C.F.R. §404.1057. The Social Security Act does not include nurses, home health aides or personal care aides in its definition of "domestic service." *Id.*

Section 1(i) of the Executive Order. DCWs provide "in-home personal care service" through home care service programs, such as the Attendant Care Services Act (Act 150).[8] Section 1(f) of the Executive Order.

Act 150's definition of "Attendant care services" embraces both personal care and domestic-type services. Specifically, Section 3 of Act 150 provides:

(1) Those basic and ancillary services which enable an eligible individual to live in his home and community rather than in an institution and to carry out functions of daily living, self-care and mobility.

(2) **Basic services shall include**, but not be limited to:
(i) Getting in and out of a bed, wheelchair and/or motor vehicle.
(ii) Assistance with routine bodily functions, including, but not limited to:
(A) Health maintenance activities.
(B) Bathing and personal hygiene.
(C) Dressing and grooming.
(D) Feeding, including preparation and cleanup.

(3) If a person is assessed as needing one or more of the basic services, **the following services may be provided if they are ancillary to the basic services**:
(i) Homemaker-type services, including, but not limited to, shopping, laundry, cleaning and seasonal chores.
(ii) Companion-type services, including, but not limited to, transportation, letter writing, reading mail and escort.
(iii) Assistance with cognitive tasks, including, but not limited to, managing finances, planning activities and making decisions.

---

[8] Act of December 10, 1986, P.L. 1477, 62 P.S. §§3051-3058.

62 P.S. §3053 (emphasis added). Under Act 150, domestic-type services are ancillary to personal care. *Id.*

Significantly, it is the provision of domestic service that would exclude DCWs from the collectively bargaining table under the PLRA, not the provision of personal care. *See* Section 5 of the PLRA, 43 P.S. §211.5. At this juncture, it is unclear whether the DCWs provide ancillary services akin to "domestic services" or just basic personal care services akin to that of a nurse's aide. If the DCWs are "serving the needs of the household," then the majority properly declared portions of the Executive Order invalid and void as contrary to statutory law. If, however, the DCWs are more like nurse's aides, providing personal care (as opposed to household) services, then the Pennsylvania Labor Relations Board would presumably have jurisdiction over the subject matter at issue and we would analyze the Executive Order from that perspective. As more facts are needed to determine the DCWs' legal status, I would deny summary relief and allow the case to proceed to trial.

_____
MICHAEL H. WOJCIK, Judge